BRITTON *v.* MICHIGAN RAILWAY CO.

1. APPEAL AND ERROR—ASSIGNMENTS OF ERROR—SUFFICIENCY.

An assignment of error that "the court erred in finding as a question of law that the plaintiff was guilty of contributory negligence," fairly and sufficiently presents the question.

2. RAILROADS—PERSONAL INJURIES—CROSSING ACCIDENT—CONTRIBUTORY NEGLIGENCE—DIRECTED VERDICT.

In an action against a railroad company for personal injuries by a 15-year-old boy who was driving a horse and buggy with the curtains up on a rainy day, testimony by plaintiff that he stopped and looked both ways when his horse's head was about 18 or 20 feet from the track, and then proceeded to cross the track without looking again in the direction from whence the car came, although it was within the range of his vision, when he was struck and injured, *held*, by a divided court, to justify a directed verdict for defendant.

Error to Kent; Brown, J. Submitted October 23, 1918. (Docket No. 4.) Decided December 27, 1918.

Case by Claude Britton, an infant, by his next friend, against the Michigan Railway Company for personal injuries. Judgment for defendant on a directed verdict. Plaintiff brings error. Affirmed by a divided court.

*Martin H. Carmody,* for appellant.

*Sanford W. Ladd* and *Justin R. Whiting* (*Warren, Cady, Ladd & Hill,* of counsel), for appellee.

STONE, J. This case is here upon writ of error sued out by the plaintiff to review the action of the court below in directing a verdict and judgment for the defendant upon the ground of the contributory negligence of the plaintiff. The plaintiff having rested his case,

upon motion of the defendant, the court directed a verdict for the defendant upon the ground stated. The action of the court in that regard presents the only meritorious question in the case. The assignments of error are criticised by appellee as too general, under the rule; but we think that the fourth assignment of error, that "the court erred in finding as a question of law that the plaintiff was guilty of contributory negligence," fairly and sufficiently presents the question. The action was brought to recover damages for personal injuries to the plaintiff, sustained about 10:55 a. m. on June 26, 1916. He was then a boy 15 years of age. The injury occurred at a crossing of the electric railway then being operated by the defendant, between the city of Grand Rapids and the city of Holland, the crossing being known as Shackhuddle crossing, in Ottawa county. The negligence complained of, and relied upon, was that the defendant neglected and failed to blow the whistle, or ring the bell when approaching the crossing, and that its train collided with the horse and buggy driven by plaintiff. The facts as to the conduct of the plaintiff are not in controversy, except as he varied his testimony upon some matters during the trial, as we shall notice.

At this crossing the railway runs north and south, having a double track, and the highway runs, practically, east and west. There is a downgrade of the tracks at the crossing, from the south to the north, the direction in which the defendant's train, which caused the injury, was moving; which grade begins about 800 feet south of the crossing, and continues beyond the crossing. This grade is a little more than one per cent. The train which collided with the plaintiff's horse and buggy consisted of a work car and two empty gravel cars. The work car was about as high as an ordinary box car—12 to 13 feet—and the gravel

cars had side dumps, about 6 feet high. The schedule of regular trains showed 21 trains to Holland, and 20 trains to Grand Rapids, daily. The plaintiff knew that gravel and freight trains were, from time to time, run over the railway. The train, as it approached the crossing from the south, was running from 25 to 35 miles an hour. Whether or not the whistle was sounded was a disputed question. The defendant did not claim that any bell was rung.

The testimony of the plaintiff was very lengthy, and cannot be all inserted here; but that part of it relating to his conduct in approaching the track, we think it our duty to here set forth. It should be said that he was a bright, intelligent boy, well acquainted with the location, and accustomed to driving the horse which he was driving that day. The trial took place in May, 1917, beginning on the 23d, about eleven months after the injury. He testified on direct examination:

"I am sixteen years old, was fifteen on the 26th of last June. I was at that time living near Shackhuddle, on the Shackhuddle road, a half mile west of the crossing. On the 26th of June last I had occasion to drive to Shackhuddle, to meet my father who was coming from Grand Rapids. I started to get him with a horse and buggy a little after ten. I had a single-seated top carriage. I live on the west side of Shackhuddle crossing, and when I arrived there I drove over on the east side, because the road was wider there so I could turn around easier.

"After I had turned around there I backed my horse up so I wouldn't be so close to the track, and stopped about 70 feet from the track. I remained there about 20 minutes, and during that time one train went through towards Grand Rapids. No train went through going the other way. After waiting there 20 minutes I drove up to Mrs. McCoy's to find out if that local I expected father on had gone through before I got there. (Mrs. McCoy lived a few rods west of the crossing.)

"Then I drove back again to the crossing, and drove across, and my horse being restless, I drove on up about 175 feet on the east side of the crossing and turned around and waited for that car. I waited there about 10 minutes, and one car went through going towards Holland. None went through towards Grand Rapids. After I waited for some 10 minutes, it looked so rainy I put on my side curtains, and then it looked so rainy that I thought I wouldn't wait for my father so I started for home. I was then 175 feet from the track. Before starting towards home, towards the track, I drove down a little ways and looked, stopped the horse and looked. I pulled the curtains loose from the top, and I looked out between the top of the curtain and the top of the buggy. I looked both ways. I looked up the track and down the track. I listened when I was there. At that time when I was there looking both ways there was no train in sight. * * * From that point I had a good view south along this track, and I could have seen a car coming along there then for a distance of a number of poles. I did not see any car coming then from the north, and did not hear any whistle. After I had looked both ways, and listened, I then drove down towards the track. I went about 120 feet. I went to somewhere around 30 feet from the track. I then stopped and listened again and I looked on the track there. I looked both ways. I looked out of the buggy. I leaned forward and looked around the side curtains. I leaned forward far enough so I could get a clear view. I listened there. No whistle was blown. I have stopped at that crossing different times. I have lived out there near that crossing about a year. I have occasion to go across there different times. About once or twice a week, driving a horse. The same horse I had that day. I had stopped there on other occasions, and the whistles can be heard for this crossing from the point where I stopped. I have nothing the matter with my hearing. I was listening that day. I heard no whistle either way. I recall which way I looked first when I stopped at the point just before crossing. I first looked south, and after looking south, I then looked towards the north. I was expecting the train with my father on from the north.

That train was past due then. After I had looked to the north I started my horse up, and after I started my horse up I kept on looking and listening, and I just started up, and in a couple of seconds I thought I was struck. I saw the car before I was struck. It seems it was standing right aside of me, just as it struck me. It was a couple of seconds between the time I started up my horse the last time and I was struck. I continued to listen for trains from the time I left the 150 feet, where I was back on the hill, until I stopped at this crossing. There was no whistle blown during that time, and there was no whistle blown after I stopped 30 feet from the track up to the time I was struck. At the point where I stopped 30 feet from the track my horse's head was about 18, 20 feet from the track. There are two trees on the south side of the roadway just before you reach the tracks. These trees are about 10 feet distant from each other. Where I stopped I was about in the middle between those trees. There is an embankment along the railroad track there. * * *

"It hadn't started to rain yet that day when I started home. It was getting ready, it looked as if it was going to start in a minute, but it hadn't started yet. It was raining when I got to the crossing. The storm came up quickly. It got quite dark. After I saw the car right there upon me, the next I recall was when I came to, and I found myself lying near the track about 50 feet from the road."

Upon cross-examination the plaintiff testified as follows:

"*Q.* You went from 30 feet to the track going 8 or 10 miles an hour, didn't you?

"*A.* Yes. I never timed them trains. I don't know how fast they do go.

"*Q.* You might have been going 10 miles, might you not?

"*A.* I might have.

"*Q.* At 10 miles an hour, and they going 60 miles an hour, they would go 180 feet while you were going 10 wouldn't they?

"*A.* Yes, sir.

"*The Court:* Thirty and 180.

"*Q.* Well, he was going 30, yes. In other words, while you were going this 30 feet that train wouldn't have gone to exceed 180 feet, would it?

"*A.* No, sir.

"*Q.* What?

"*A.* No, sir.

"*Q.* It couldn't have, could it?

"*A.* No, sir. Undoubtedly I would have heard it there, if it hadn't been for the storm.

"*Q.* And you could see a car coming between four and five hundred feet, couldn't you?

"*A.* Yes, sir.

"*Q.* And when you got down at 25 feet from the first rail, you could see clearly a car coming clear from the top of the hill, couldn't you?

"*A.* Yes, sir.

"*Q.* Well, it must have been in there somewhere, wasn't it?

"*A.* I wasn't looking that way just at that second.

"*Q.* Oh, you weren't looking that way, is that the idea?

"*A.* I wasn't looking that way just as they happened to come along there.

"*Q.* You were looking for a car in the opposite direction?

"*A.* Yes.

"*Q.* In other words, from the time you left this point 30 feet back, you were looking for the car that you expected in the opposite direction?

"*A.* Yes, sir.

"*Q.* Although this car was right there in sight, must have been?

"*A.* Must have been.

"*Q.* But you didn't see it?

"*A.* I didn't see it.

"*Q.* You didn't look at it?

"*A.* I didn't see it until I got right on the track.

"*Q.* Until you got right on the track? In other words, you went this 30 feet looking for the car in the opposite direction, is that right?

"*A.* I wasn't looking that way at all. I was looking—

"*Q.* But that is what you were looking for, the car you thought your father was coming on?

"*A.* Yes.

"*Q.* From the time you left 30 feet back there, you were watching for that car?

"*A.* Yes.

"*Q.* Although this car that hit you was in sight in that distance?

"*A.* Yes, sir.

"*Q.* Now this horse wasn't going so fast but what you could have stopped it?

"*A.* I presume not. I could have stopped it.

"*Q.* Why, sure, you could have stopped it at any point along there, couldn't you?

"*A.* Yes, sir.

"*Q.* So that if you had looked in the opposite direction you would have seen the car, wouldn't you?

"*A.* I presume I would.

"*Q.* And you could have stopped your horse?

"*A.* Yes, sir.

"*Q.* At any point from the time you left this 30 feet back there, is that right?

"*A.* Yes, sir.

"*Q.* But you didn't, did you?

"*A.* No, sir.

"*Q.* You were looking for the car in the opposite direction, is that right?

"*A.* Yes, sir.

"*Q.* Weren't expecting this car?

"*A.* Wasn't expecting it."

On redirect examination he also testified as follows:

"*Q.* Now, when you got within 30 feet of the track, counsel has asked you if you continued looking the other way. At that point where you stopped 30 feet from the track, which way did you look first?

"*A.* Towards Holland. I looked carefully that way. There was no train in sight then. I am sure of that. Then after I looked that way I looked the other way and started my horse up. Then I looked towards Grand Rapids last, because I knew that car was late and was looking for it any minute, any second. When I looked that way I immediately started my horse up. After looking towards Holland I looked immediately towards Grand Rapids, and I started my horse up then when I looked towards Grand Rapids.

"*Q.* State what you did in the way of looking after you started your horse up?

"*A.* I started my horse, I kept on looking, and kind of that way (indicating) and just stopped looking and listening; as I got on the track I was still looking and listening, and I caught sight of that other car; I bent over looking, and I just got through looking there (indicating) when I saw this other car right at the side of me. I had started to look back the other way then. I just got through looking towards the north, and started to look towards the south again as I got to the track, and just as I got to the track, I seen it was on top of me."

Later, the plaintiff was recalled and stated that he wanted "to make some corrections" of his cross-examination. Those corrections related to the speed of the horse, which he changed to about 5 miles an hour; he also corrected his former testimony as to the distance he could see south at 30 feet from the track, testifying:

"At 30 feet, on that day I could not see over 150 feet; on a clear day I could not see over 300 or 400 feet."

Again he testified that he could see up the track about 200 feet.

Plaintiff's testimony relating to the direction and way in which he looked after leaving the point 30 feet from the track remained unchanged. But one just conclusion can be reached from his testimony: Plaintiff was expecting his father on a car coming from the north, and during all the time that he was approaching the track from the point 30 feet east of the track, until the car was upon him, he was looking in a northerly direction, and never once looked towards the south, the direction from which the work train was approaching, with which he collided. Had he looked south he would have seen the cars, for, according to the undisputed evidence, they were at that time within the range of his vision.

We agree with counsel for appellant that upon the

subject of the contributory negligence of the plaintiff, the question "must be determined largely from the testimony of the plaintiff."

. The ground upon which the trial court directed the verdict is clearly stated in its charge as follows:

"A view to his left any time after he passed the tree would have disclosed the fact that this car was coming. He says he could have seen 150 or 175 to 200 feet to the left if he had looked, could have seen it if he had looked. It seems to me that there cannot be any question about it, but that his failure to look —and he said he had his horse entirely under control, could have stopped at any time or place from the 30 feet up to the track, that he could have seen the car within 175 feet south of the road if he had looked— it seems to me to be clearly an admitted fact of negligence to fail to look."

In treating that question as one of law, the trial court referred to the case of *Bray* v. *Traction Co.,* 191 Mich. 435, and quoted the following language of Justice MOORE, who wrote the opinion in that case:

"On his [plaintiff's] cross-examination he made it even more apparent that he looked but once, and that, if he had looked just before going upon the track, when there was an opportunity to do so, he could have seen his danger in time to avoid it. Under the version given by the plaintiff of the occurrence, we think the trial court was justified in directing a verdict, for the reason given by the following authorities."

See cases there cited; also *Congdon* v. *Traction Co.,* 199 Mich. 564.

We are left in no doubt concerning the manner in which the plaintiff was injured. As was said by Chief Justice OSTRANDER in *Knickerbocker* v. *Railway Co.,* 167 Mich. 596, 602, in speaking of an infant ten years of age killed at a railroad crossing, we may say here:

"His intelligence and his ability to appreciate the danger which actually threatened, and to avoid it, if

seasonably discovered, cannot be questioned. He did not discover the actual danger. Under the circumstances, he was chargeable with some degree of care for his own safety, and it does not appear that he exercised any care. The jury should have been so instructed."

See, also, *Mollica* v. *Railroad Co.*, 170 Mich. 96 (L. R. A. 1917F, 118), where a boy under ten years of age was held guilty of contributory negligence. The presence of the storm called for increased vigilance and care.

Some of the language of the trial court, in its charge directing the verdict, is criticised by appellant's counsel. Upon this subject it is sufficient to say that affirmance of the judgment does not imply agreement with all that was said to the jury in directing the verdict. *Schneider* v. *C. H. Little Co.*, 200 Mich. 374; *Lewis* v. *Brick Co.*, 164 Mich. 489, 501.

We find no reversible error in the rulings of the court relating to the admission of evidence. In our opinion the court did not err in directing a verdict for the defendant, for the reason stated, and the judgment below is affirmed.

OSTRANDER, C. J., and STEERE and BROOKE, JJ., concurred with STONE, J.

MOORE, J. (*dissenting*). I think the testimony presented a question of fact which should have been submitted to the jury.

BIRD, FELLOWS, and KUHN, JJ., concurred with MOORE, J.